The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. Good morning everyone. The panel has reported three cases. Two will be submitted later today on the basis of the briefs without oral argument. Those two cases are Appeal 2008-3052 Jones v. American System Protection Board and Appeal 2008-5027 Spain v. United States. On the argument list we have Appeal 2007-4042 United States v. Ford Motor Company. Mr. Silver? Good morning. Welcome to you. Good morning, Your Honor. Please proceed. May it please the court, this is the second time that this case is being presented to this court. In its initial decision the- We're quite familiar with what happened before, so maybe you can jump right to the heart of your contention in this appeal. It's very simple, Your Honor. In the first appeal, the case was remanded back to the Court of International Trade to do three things. Recalculate the penalty to exclude timely duty tenders, recalculate the penalty to exclude duty tenders outside the scope of the investigation, and recalculate the penalty to reflect the absence of 1484 liability. Why would that require recalculation? This court specifically required the CIT to recalculate the penalty to do that. As a matter of law and logic, why would the penalty have to be recalculated based on whether the liability arose under 1454 v. 1455? Either one can support a double penalty, as I understand it. You are correct, Your Honor. But you had two violations here that formed the basis of the CIT's decision. And with that two violations, he wound up with a 200 percent maximum negligence penalty. This court reversed any liability under 1484, one of the two prompts, the two bases for this penalty. And the court, in its infinite wisdom, sent it back specifically to recalculate the penalty to reflect the absence. In my view… Maybe that simply meant that if Judge Schakalos had been relying on the violation of the 1884 as opposed to 1885, that he might recalculate. But if his determination originally didn't differentiate between 1884 and 1885, then presumably he wouldn't have to recalculate. So maybe what we meant is to ask him what he meant, what he was relying on. And even though his opinion is rather short, he told us on that point that he wasn't relying on 1884. Mr. Silverman, what you meant wasn't the penalty lowered by about a third? Didn't the judge give reasons why there should still be a doubling? In other words, didn't he get all the title to him in terms of remand? In our view, Judge, the Court of International Trade did exclude the timely tenders and he did exclude the tenders outside the scope of the penalty investigation. But the court did not recalculate the penalty to reflect the absence of 1484 liability. Or you could say he recalculated it in the same amount. Because he concluded that it made no difference whether liability rested on 1884 versus resting on 1885. Well, we think that in the context in which this statement is made, that that was an indication that the court should lower the penalty. At a minimum, let's say that we're wrong on that point. At a minimum, the judge had to perform a penalty analysis with 1485 as the basis for the penalty. And the court should have provided us with an analysis. All the court did here was re-utter the words that he had in the prior decision. He had these three reasons. He picked them up again. There's no work. There's no effort. There's nothing other than I'm going to come up with the same penalty and I have another way to do it. But hadn't he assessed the equities initially? Yes. He made various arguments. He produced evidence. I understand. He analyzed it. He found certain equities were in your favor. Certain other equities seemed to be in the government's favor. You seem to be saying he would have to repeat all that in his remand opinion for it to pass muster. I think once you take out the 1484 violation, which in our view is more serious than the 1485 violation, if you look at this case as a late-filing penalty case, late-filing duty-tending case, which it was, then his penalty calculation should have been renewed again with that in mind, with the fact that the loss to the government here was a loss of use of money, sometimes for two months, six months, eight months. And you can't impose a 200 percent penalty across the board. Mr. Silverman. Yes, Your Honor. Is there language in the opinion going back to the CIT that the judge did not abuse his discretion in imposing a maximum penalty? I think, yes, that's correct, Your Honor. But it seems to me that that language reflects the penalty as presented then. When you remand it back to the CIT to recalculate the penalty to do three things,  And the court doesn't have unfettered discretion. First of all, it has to follow the mandate of this court. But you never answered the question as to whether or not there was an abuse of discretion by the trial judge. We think that the first thing the trial judge has to do is follow the mandate. And if the judge doesn't follow the mandate, it has to go back to the trial court. Besides that, Your Honor, we argue that the trial court's decision is clearly unreasonable for a number of different reasons. That's abuse of discretion. We think it should go back to the trial court again because he didn't follow the mandate. If you think he followed the mandate, then we think he has abused the court's discretion in determining the penalty. The fact that you found the first time that he did not abuse discretion has nothing to do with the second go-round because you have a whole new playing field here. Well, it isn't a whole new playing field. You have one less infraction, but all the same transactions and all the same equities. But it's the nature of the violation, Judge. Before, you have an instance where somebody doesn't do something at the time of entry. And here, it's late filing. But either one can get you double penalty. There's no doubt that this court, that the CIT can wind up with a 200% penalty for a 1485 violation. But the judge didn't do what you had asked him to do on remand. That is our primary position. And when you come up with a 1485 violation here, which is a late filing. Remember, this is a company that had procedures. They were filing duty tenders before the investigation came up. And they were filing them after the duty tenders came up. If I could take a second and refer your honors to the joint appendix at A40090. It's an appendix, too, that we attach to our trial court brief. At the top of the page, Judge, you have a listing of lump sum duty tenders that were done, 88 through 92, that are not the subject of this case. At the bottom of the page, you have the duty tenders that are the subject of this case. It's 40090. Some of the duty tenders in the bottom half of the page have been eliminated in the first decision. If you look at the top part and the bottom part, you'll see you have the same programs in both. So in 88, 89, and 91, and in this case, Ford's filing on Festiva vehicles, engines, and transmissions. In fact, if you go back and look at the index, the joint index in the first appeal, and if you compare the filings here, you'd find them at A30080 through 82, that's these November 2, 88 ones. 30095 through 97, that's the November 89 ones. What's the point? The point is that the submissions that were done before and after, it's a form letter, Judge. It's not a question of non-file. 1485 could be you found out about it and you never filed. Here, they found out about it and they were filing. He didn't think that there was a total absence of reporting here. It seemed clear that everybody agreed that the filings were made and they were accurate, but they were late by a very extensive time. Extensive time is two months, six months, eight months. You talk about a, for these tenders, you talk about a loss of interest of $75,000 and a penalty of close to $6 million. That seems to me to be pretty excessive under the circumstances. One of the questions that I have is comparing the two briefs, the briefs that you filed before and the briefs that you filed after, they're the same arguments, exactly the same arguments. For instance, in one particular section of the brief, you point out that the trial court should weigh in favor of the good faith effort to fulfill the statutory obligations and suggest that CIT's original opinion included finally supporting such good faith. And that's your blue brief of 20. Identically, when you file your other brief, it says that it is, good faith should be considered a mitigating factor argument to CIT's own findings demonstrating it was a good faith effort. Are these arguments being remade all over again? It's the same arguments but in a different context, Judge. Before, the arguments were made in the context of a liability hearing and also in the context of a penalty hearing based on 1484 and 1485 violations. Now it goes back to the CIT and we think, first of all, the judge did not follow the mandate of this court. And second of all, if he did, that his penalty decision is unreasonable for these reasons. He needed to take these things into consideration again when he was directly requested to recalculate. This court did not have to ask the CIT to recalculate its penalty for the third point. We had another case at the same time, a companion case, another Ford penalty case, where you came to the same conclusion on 1484 that there's no liability for failing to annotate entries at the time of entry to say prices are provisional. But you did not remand it back to the CIT to recalculate penalties in that case. We think the fact that you did that here is an indication that you wanted the CIT to take another good look at this penalty and do a calculation. Which if they did take a good look at it and they said whether it's 1484 or 1485, then there's no abuse of discretion that could be engendered to that opinion. Where did the judge abuse his discretion in that particular process? In the current process? Well, first of all, we think he didn't follow the mandate. Second of all, we think that just re-uttering his words from the prior decision is not what was required under the circumstances. Third, we think that the mandate required him to reduce the penalty, going from two violations down to one, a lesser violation. Besides that, look what the judge used as an example. He said, we have a great interest in making sure that the customs regulations are enforced. We all have that interest, but there were no regulations here. There were no regulations. There were no directives. There was nothing that was issued to the field. The only thing that was out there that caused people like Ford was to make informal arrangements with the Customs Service and interpret them as best they could. And the Customs Service, again, said nothing. They never complained. They made informal arrangements. I thought that was a formal written agreement that the two parties arrived at and that Ford directed. I say informal. You know, it's not like, to me, a formal arrangement is selling jets to the Air Force. It's highly technical. This is an agreement between Ford and the operations people at Detroit, and it's a working arrangement. Ford kept the other side. They kept letting them know, these are the programs we're working on. We're filing this one. We're filing that one. Importers should have a right to be able to rely on these agreements. And you can't have another part of the agency, the customs agents or the penalty branch, come back 10 years later and say, well, you guys had it wrong all this time, and now you're subject to massive penalties. The deadline is 60 days after the end of the model year. I can't imagine anything would be clearer than that. Wait. You have to look at the whole agreement. It says 60 days, because there's a conflict. There's an internal conflict here. It says 60 days from the end of the model year, but it also says you can only do these filings on liquidated entries. The customs service is in full control of when entry is liquidated. What the person from Ford testified was, she would gather the data during the year. When the entries were liquidated at the end of the year, she'd get them together. You have to compare the two, and then you can do your analysis. So what does somebody from Ford do at 60 days if the entries aren't liquidated? She completes her analysis. And the liquidation of the entries is very important. If you want to take a second, Your Honors, and look at— Sorry, give me a second. If you look at, again in the appendix, A200018, this is part of her analysis. You can see these are engines. Some of the engines went to Canada. Some of them are going to be due to 2.5 percent. Some of them are 3.5 percent. What does that have to do with whether the 60-day deadline was clear? It was. You created an impossible circumstance. At the end of 60 days, Ford is supposed to do a filing. But they can't do it if the entries are not liquidated. And the person in—sorry, organization in control of liquidation is the Customs Service. And what Ms. Monroe testified to— In the circumstances that apply here, what are you suggesting the due date was? If it wasn't 60 days, what was it? It was as soon as she could do it after the entries liquidated. And that's what she did. Was the instance of 14 months delay as soon as she could have done it? She said she filed these as soon as she could, and that there were business delays or customs delays, and that's the best she could. And she told the Customs Service. She didn't specifically ask for an extension, but she said, this is what I'm working on, now I'm filing. And if she's doing it in 88, 89, and 91, and they're not saying you have a problem, then when it comes to 92, she shouldn't be penalized, $6 million for those filings. Well, if they're in breach of the agreement that Ford wrote, why not? Because you have to look at the whole agreement. You can't say, well, if we complied for three years with our agreement, it's improper to penalize us in a fourth year when we didn't comply with the agreement. That doesn't make any sense. I mean, not to me. What I'm saying, Judge, is the entries, the agreement does say 60 days from the end of the model year. On the other hand, it also says you need to do a filing on liquidated entries. And the person who was doing the filing got the entries, and when they were liquidated, she filed. There's an inherent conflict in the way the agreement, if you just say 60 days, what do you do about entries that are not liquidated? You're supposed to only have one filing. Your Honor, if you're correct, then there's no liability here at all. And that's already been decided. So I don't see how we get into abusive discretion on failing to mitigate below 2.0 multiplier when your argument seems to go entirely to whether there's any underlying liability, which has already been adjudicated. Your Honor, these are points that I am responding to your question. I think in terms of liability here, we should go back to the CIT because they violated the mandate rule. You can't just do what you did before. I think the court's decision is clearly unreasonable because the entire landscape has changed. This agreement is not going to come up for reinterpretation. The reconciliation program, that's the formal agreement that I would say, that's a formal agreement, was created. It covers flagging entries, how and when to file reconciliations, and even what the penalties should be. Ford and importers are on that program, Judge. That means you don't need a big deterrence penalty. A 200% deterrence penalty does not fit with the purpose of the statute. It's clearly unreasonable because it doesn't reflect the nature of the offense, the minor injury to the government. It disregards Ford's good-faith efforts. It disregards the fact that there were no regulations or bright-line standards for Ford to follow. And it disregards the fact that customs knew when Ford was filing. Under customs' own mitigation standards, the penalty shouldn't be more than one times the loss of revenue. Mr. Silverman, it's the same arguments you made before, so it's just a repetition of what you did in Ford 1 and Ford 2. I still don't understand how you can come back and say, well, we're going to be making the same arguments on the same basis because the judge below abuses discretion, which we found did not abuse his discretion by causing a maximum penalty. Mr. Silverman, where is the abuse of discretion, which would cause us to reverse the judge below? To reverse the judge below, you don't need an abuse of discretion. You have to hold that he did not comply with the order of the mandate of this court. That's our principle argument. In terms of abuse of discretion, I've given you my points. I don't need to continue to belabor them. We've given you a lot of extra time, so we'll hear now from the government. Thank you. Good morning. Good morning, Your Honor. Please proceed. The mandate required the trial judge to recalculate the penalty by backing out the tenders that were outside the scope of the investigation. That's not disputed. The ones that should have been excluded were excluded. Can you just talk about what is disputed here in this appeal? The judge said in the remand decision that he looked at 1484 and decided that that wasn't the primary basis for the double penalty or the double multiple in the first appeal, or following the first trial. He looked at the factors that he felt were relevant in what the appropriate penalty ought to be, including Ford's bad faith, the duration of the violations, which extended over six years, the amount of goods at issue, Ford's lack of good faith. I thought the whole issue here was the proof of negligence, not bad faith. Ford was proven to be negligent at the trial, and one of the factors that the trial judge considers in determining the multiple to apply to the loss of revenue is the good or bad faith of the importer. In this case, the court found that because the entries extended over six years without Ford reporting, pursuant to a very clear agreement, because the amount of goods affected was over $350 million, because it needed to be a deterrence impact from whatever penalty was imposed, that the appropriate thing to do was to calculate the loss of revenue and to multiply it by two. That's what the court did. That's what this court said was appropriate in the first appeal. The court said to recalculate the loss of revenue because of the 1484 confusion. The trial court did that, wrote a remand decision explaining exactly what he did, which was to take out the tenders that you instructed be taken out and to reexamine what ought to be the multiplier for it. And he looked again at the same factors and concluded that a violation is a violation. This violation was 1485 involved five more years that Ford held off and only in response to subpoenas did it come back and start to say it was complying with the agreement, that it provided information on these post-entry payments to customs promptly, and it never did that. And the trial judge did everything the mandate asked him to do. I don't know what else he could have done. He explained it pretty clearly in the remand decision. Was there a oral argument on remand? The parties got together and did as much of the work as they could do before going back to the judge. On the multiplier or just on the exclusion? On everything. On the amount of loss of revenue, and there were arguments on what the appropriate penalty ought to be. We argued for the continuing double multiplier. They argued for less. The judge came out when it came out. On paper? In presenting these arguments? Yes. We had post-we had remand briefs, an exchange of remand briefs. But no oral argument? I don't recall there was an oral argument. I think he just wrote in response to the briefs. Judge Tsoukalos wrote in response to the briefs. Let me ask you an economics question. Yes. If the essence of what happened here is that duties that should have been paid on a certain date were paid late because of late finance by Ford, why isn't the lost revenue as a matter of law just the time value of the money that came to customs belated? The law imposes an obligation that the duty is due upon entry. The tax is due upon entry. The tax wasn't paid on entry. The loss of revenue until the appropriate amount is customs is informed of the appropriate amount later is the amount that should have been paid on the entry. What you're talking about is interest on the unpaid amount. And there are circumstances in which the penalty is based on interest only, not a double multiplier against the loss of revenue. That's only when. I'm really asking, what does it mean to say loss of revenue? Here, the revenue wasn't permanently lost. It was delayed for some periods of time, varying by the transaction. It's really not quite. The point you make is a valid point from the standpoint of pure economics. The statute, however, defines the loss of revenue as the amount that should be paid on entry based on the value of the merchandise being imported and the classification of the merchandise under this tariff schedule. That if that is not provided at the time of entry from the standpoint of the customs service, there's been a loss of entry, a loss of revenue as of that time. The fact that it's paid later. I'm not doubting that there was a loss of revenue because a lower amount was paid upon entry than it should have been paid. Nothing was paid. A lower amount was paid upon entry than it should have been paid. And so why isn't the way to fix that deficiency to require that the penalty reflect the actual harm to the government, which is that they got their money later than they were penaltyed? That's what the penalty is based on. The loss of revenue calculation is the difference between what was paid on entry and what should have been paid on entry. That loss of revenue is multiplied by two to come up with a penalty figure. That's what the statute requires. It wasn't required doubling the penalty. No. It just allows it. That's right. That's the maximum a judge can do on a negligence fine. And that's what the judge did. He could not multiply it at all. Theoretically, he could find a zero multiplier. Or 1.0 or 1.5 or anything not exceeding 2.0. And your job is to examine whether the process he went through was a rational process or an arbitrary process. And he went through it twice. And he looked at what he did the first time and said it was rational. They're making the same arguments this time that they made the first time, as your questions have revealed. And they're asking you again to say it's not rational when you already said it wasn't rational. In a lot of ways, it's inefficient. The way this is coming out is two bites of the apple. And the law of the case, arguably, and as we've argued in the brief, ought to prevent you from really going along that road. Because they're presenting the precise arguments this time. They presented the last time. And when you ask a lawyer to say what's different, at least in my years, I didn't hear much that came out that stated what was very different. So it seems to me the question is did the judge follow the mandate? And you answer that by saying or by looking at what the judge said he did. There's no basis to think the judge didn't really do what he said he did. And what he said he did in the remand decision is to do what this court asked him to do. And he went through a process by which he did that. And he states in the remand decision exactly what that process was. So if the issue is did he follow the mandate, the answer is he did. If the issue is did he abuse his discretion, we think you shouldn't allow a second bite of the apple. But should you agree that you should, you've already answered it. Because there's nothing different here than there was before because there are equally serious violations now as there were before. This business about one violation being more serious than another is not factually correct. I mean the violation that could be penalized for, 1485, resulted because Ford didn't declare the appropriate values until a subpoena. The government began an investigation, subpoenaed the information. Only in response to the subpoenas did Ford come up with the information. That's pretty serious. The 1484 is really the same thing, that they didn't tell customers what the value of the merchandise was when the merchandise came out. So you're saying that the discretionary government is justified now, as it was before, and the amount of what the fact was recalculated. That's what we're saying. And for the reasons that Your Honor suggested in the questioning of the appellant's counsel, that the factors that the judge looked at the first time, he really looked at. You looked at it yourselves in review the first time and said it was fine. Nothing has changed. He dropped out of 1484. You looked at it the first time and you knew 1484 was out. Because you ruled it was out. And you said it was okay. Well, we ruled that it was out and we sat it back and basically made a determination whether 1485 would be sufficient to support the calculation. And he did that. He knocked out anyone that related only to 1484 and he decided 1485 supported the same multiple, for the same reasons he suggested earlier, which Your Honors looked at earlier. Mr. Levin, what's the practicality here of the way this regime works, or is supposed to work? Do you start out with the assumption that the penalty should be double the lost revenue, unless the importer can somehow talk the judge out of it through proof and argument related to the mitigating factors? This court hasn't really gotten into that at all, as far as I understand it. The district judge, or the court of international trade, twice has done a thorough examination of how they feel of the process at work. And it's not that. It's more an eclectic kind of... What I'm trying to get at is, should the government have to show a multiplier is appropriate to the starting out presumption 0.0, and then you go up from there according to the government's proof of bad behavior by the importer, versus starting out with the assumption that the multiplier is supposed to be the maximum, that is, 2.2, and working down, if and to the extent that the importer can convince the judge that there are mitigating factors of material sort in its favor. Which way is it supposed to operate? The statute doesn't make it clear, and the courts haven't really made it clear. What the courts have said is, it's neither of those. There are no presumptions that it should be the maximum, there are no presumptions you should start at 0. You simply listen to what the parties say, and the plaintiff, who's the government, has the obligation of proving what it feels the appropriate penalty ought to be. And you weigh the evidence like a jury would weigh the evidence. Well, if what you said is right, that the government, as the proponent of a particular penalty, would have the burden of proving the fact that we justify such a penalty, then that sounds like the way it should work is to start with 0.0, and then based on the strength of the government's proof, you go up, not to exceed 2.0. I think the government has a prima facie obligation to present factors that bear upon a high penalty, that's what the government is seeking. Then the burden shifts, I think, that if there are mitigating factors, the judge in his discretion can take those into account. And all of that was done before Judge Tsoukalos in this case. The government presented what it felt were the egregious factors, mainly the ones I mentioned. Ford came back, as it has today, with what it regarded as mitigating factors, that the penalty shouldn't be serious because the violations weren't serious. And the judge made a decision weighing it all out. And this court affirmed the decision the first time, and in our opinion ought to affirm the decision this time. If we thought it made no difference whether liability rested on 1484 versus 1485, then why would we have remanded? Why wouldn't we have just said, since it makes no difference, we don't even need to remand to ask him what he was relying on, because as a matter of law, we're determining it wouldn't make any difference, in which case we simply should have affirmed, not remanded. Isn't that right? Yes, yes. The way we read the remand order from this court in the first appeal is that when the court was referring to the 1484, what it was worried about was whether there were any losses of revenue based on 1484 alone, that when the trial judge calculated what the loss of revenue was, that he might have included some tenders that only violated 1484. And there was one, and that was in the SCAPRE program. There was an August tender, as Your Honors pointed out the first time around, that was within the 60 days. And that was penalized anyway under 1484 as the trial judge determined on the remand. So we read the 1484 obligation in this court's order as the need to back out any that didn't violate both sections. And there was one, and that was backed out. But it's ambiguous. What this court said the first time, in terms of its... The author of the opinion is here, so he may know, but from our point of view, reading it, the words, it's a little ambiguous on how far you wanted the trial judge to go in dealing with 1484. But the trial judge didn't want to be reversed again, so he probably went overboard to feel you wanted an expansive review on remand, which is what he did. I think you're right that there were some 1484 elements that should have been backed out. And I think he did that. He did that. Was there any portion of the trial back in 2005 that dealt with the penalty of discreet issuing? It was more in the briefing. You know, you had witnesses who were describing... Their witnesses are saying we're innocent and the customs is at fault and so on and so forth. The judge heard that. Our witnesses, who were import specialists, would say, we asked for it 25 times to do it the right way. We have a clear agreement. No one else we know about that is at the stature of Ford ever does it this way and so forth. The judge heard all that. The briefing then said, in light of that evidence... Was any evidentiary material excluded that went off by either side? Was this thing fully aired? Judge Tsoukalos, as I recall, eliminated or refused to include... refused to take into the record very little, if anything. I don't recall any testimony that was excluded, and I don't recall any exhibits that were. This was a pretty... It was quick. He acted very quickly. He had two trials, two weeks in one trial and two weeks in another trial, right after each other, so he didn't waste time. But everybody presented fulsome evidence, five, six, seven witnesses per side in lots of exhibits. There was nothing unfair about this proceeding. Were there post-evidentiary submissions that argued about equities and the multiplier? Yes. Based on the testimony and the exhibits, one portion of each side's briefs related to what the penalty ought to be. So if there are no further questions, Your Honor, I've covered the points I had. We thank you for your time. Thank you, Judge. When Judge Tsoukalos made his remand decision, he said, this court did not declare Section 1484 violation as being the primary basis for imposition of maximum penalties. To me, that means it was part of his original decision, and he had to go back and take that out, factor it out, and he did not do that. To answer one of Your Honor's questions... Well, why do you say he did not do that? Why can't his opinion be heard as saying, I considered whether I should lower the multiplier below 2.0 in view of the fact that many of these violations, all but one, I guess, that used to rest on two statutes, now only rest on 1485. So I have to decide whether that makes a difference. I answer that question, no, it doesn't make any difference. The equities are the same. I think when Your Honor sent it back, that you intended for him to reduce the penalty by taking out 1484, and he should have taken out part of it to come out to a lower number. I think he did take part of it out of the 1484 elements. I'd like to address that, Your Honor. If you remember, the remand asked for three things. One of them was to reduce timely tenders. That's your 1484 piece. You wouldn't have done that and asked him to take out 1484 because it's asking to do the same thing twice. So this could only refer to those tenders that remained in the case after these others were excluded from points 1 and 2 of your remand, and all of those together, he said 1484 and 1485 violations for every single one. There are no just 1485 or just 1484 violations. The other thing you asked about how the judge calculated the penalty here, and I think if you look at his opinion, it's clear that the judge says Ford's penalty does not warrant mitigation. He's working from the top down. The CIT can go from the top bottom up to the top down, but here he went from the top down. He didn't take anything out for 1484. Mr. Levitt said one thing that I find particularly disturbing. He has a lot of trials, and maybe he doesn't remember. Witnesses. We had five witnesses talk about what the programs were and how to a file. Two people wrote the agreements, one of them being 35 years employed with the Customs Service, and then you had two people do the filings, and then the head of their Customs Department also spoke. The government had not one witness explain the agreements. Not one person testified that they asked Ford for documents, and Ford was late. Not once. And it's outrageous for him to make that claim in this court. If the court has no further questions. We'll take the case under advisement. Thank you. Thank you very much. All rise. This honorable court is adjourned until tomorrow morning at 10 o'clock a.m.